

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

**STATE OF TENNESSEE v. CHRISTOPHER L. SMITH**

**Appeal from the Circuit Court for Franklin County**
**No. 2015-CR-170     Justin C. Angel, Judge**

_____

**No. M2016-00662-CCA-R3-CD**

_____

The defendant, Christopher L. Smith, pled guilty to two counts of aggravated burglary and one count of aggravated assault, all Class C felonies, in exchange for an effective sentence of six years with the manner of service to be determined by the trial court. Following a sentencing hearing, the trial court imposed a sentence of confinement, which the defendant now challenges. After review, we affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

B. Jeffery Harmon, District Public Defender; and R. Chris Albright, Assistant Public Defender, for the appellant, Christopher L. Smith.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; James M. Taylor, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted for multiple charges stemming from a continuous course of criminal conduct that took place in both Marion and Franklin Counties. The defendant waived venue, and the charges were addressed together in a single guilty plea hearing held in Marion County. Under the Marion County indictment, the defendant pled

guilty to aggravated burglary and aggravated assault and by agreement received three-year sentences for each offense, to run concurrently with one another. Under the Franklin County indictment, the defendant pled guilty to aggravated burglary and by agreement received a three-year sentence to run consecutively to the Marion County sentence. The defendant received a total effective sentence of six years with the manner of service to be determined by the trial court.

At the guilty plea hearing, the State recited the facts it would have presented had the case gone to trial:

> Your Honor, if we had gone to trial against [the defendant], we would be calling a number of witnesses, both in Marion County and Franklin [County]. It's all one event and if it's okay with the Court I'll just tell the story.
>
> . . . .
>
> Your Honor, we would be calling first of all, Mr. Danny Hibbs, and Mr. Danny Hibbs' wife, who would testify that back on February the 24th of [2015], that they were at home . . ., there was family present. They were trying to get some sleep and in the late . . . hours into the early morning hours of that particular night they heard a noise. They heard banging on the door. [The defendant] came into their home. Mr. Hibbs was armed. It could have been a – we could have been dealing very easily with [the defendant's] funeral on that count. But he was incoherent, he was making irrational yelling noises. Making demands. He did some damage to the home. This prompted ultimately law enforcement to become involved and as he was there, law enforcement arrived including Sergeant Tim Prince, with the Marion County Sheriff's Department[,] along with Deputy Chris Ladd from the Marion County Sheriff's Department among others who responded to this. The Defendant, this was . . . at the time when there was snow on the ground, it was very cold outside. The Defendant was running around barefooted in his pajamas, making incoherent statements. Ultimately when the officers arrived there, Sergeant Prince and Officer Ladd, who are sizable individuals at least not small men began to engage in . . . trying to arrest the Defendant. He fought them to the point where . . . Officer Ladd was injured, was out of work for several months, and had to have surgery on his shoulder. Additionally, . . . Sergeant Tim Prince also was engaged in trying to arrest him and had to ultimately use a tazer. [The defendant] grabbed the tazer and after it had penetrated him, pulled it out and bit[] it, and then ran off through the woods.

Ultimately the Defendant did obtain a vehicle of another individual without that individual's permission. He began driving erratically and ended up in Franklin County.

Judge, at that time, he once again irrationally making comments and statements busted into the home of the Johnston[s], homeowners there in the Sewanee area, the school area. Mr. Johnston actually was armed and in his room there was yelling going on as the individual came in. Something about his daughter needing help, but his daughter was not in the area. There's blood – there is glass busted out in the living room, there is blood spattered in the home where he was injured and bleeding probably from the run through the woods, and also due to the breaking of the glass.

We would possibly be calling personnel from the [Tennessee Bureau of Investigation] who would testify that the substance in the . . . home . . . was, in fact, blood. And maybe would testify that that blood matched the blood of the Defendant.

Mr. Johnston, who kept his head, and nevertheless felt at one point as he saw the door knob turning coming into his bedroom with his wife present and with a child in another room nearby discharged the weapon over the top of the doorway in such a way that very likely would not strike him, and did not strike him. That seemed to temporarily calm him down, but he ran back outside, the Defendant did. Other law enforcement officers came there from Sewanee Police Department, who would also testify some of them also engaged him in . . . trying to arrest him. And one to the point that he . . . was so exhausted he literally vomited while in the home of the Johnston[s].

Ultimately, [the defendant] was apprehended, . . . we would be calling personnel from Emerald-Hodgson Hospital who would testify that he was babbling incoherently at the hospital. No statement could be taken from him at that time. That all of this occurred, the first charges referenced occurred in Marion County and the other charge occurred in Franklin County.

The trial court conducted a consolidated sentencing hearing at which Deputy Chris Ladd, of the Marion County Sheriff's Department, testified that he first became involved with the defendant after receiving a series of dispatch calls that ultimately led him to the scene of a home invasion "where a subject had just kicked the door in at a residence and

-3-

run in their house." Deputy Ladd and Sergeant Tim Prince encountered an "individual wearing a pair of pajama pants and a white T-shirt running down the road in the snow," not wearing any shoes. Upon seeing the officer, the subject began to run, and Deputy Ladd gave chase and tackled him in a ditch. The subject went "haywire . . . screaming kill me." Deputy Ladd described the subject as "incoherent," explaining, "[Y]ou could tell by looking in his eyes that there was something wrong with him." Deputy Ladd and Sergeant Prince fought with the defendant on the side of the road for seven to ten minutes, even shooting him with a Taser stun gun. Deputy Ladd expounded on the use of the Taser:

> Usually it only takes one pop, one cycle. He took five and after the fifth one, I mean it was he just reached around and grabbed the leads, which [are] the wires that are attached to the cartridge, which lead to the darts that are injected. He grabbed the leads while 50,000 [volts] w[ere] going through it and put 'em in his mouth and was sitting there trying to break 'em with his teeth and sparks just ejecting out of his mouth.

Deputy Ladd stated that, ultimately, however, the defendant escaped. The officers went to Franklin County and caught the defendant after he crashed a truck he had stolen into a tree and was engaged with other police officers in a fight. It took six or seven officers to subdue the defendant. As a result of his fight with the defendant, Deputy Ladd sustained a torn rotator cuff and damaged tendons in his shoulder. He underwent surgery and was off work for ten months.

Patrick Allan Johnston testified that, during the early morning hours of the day in question, he, his wife, mother-in-law, and eight-year-old son were asleep in their home. At the time, Mr. Johnston had recently undergone surgery and was "basically . . . bedridden." Mr. Johnston was awakened by the sound of his dog barking and pounding on the door. Within seconds, he heard glass shatter and knew that someone was intruding. Mr. Johnston armed himself with his AK-47 weapon and "started screaming I have a gun, I will shoot you." The intruder was screaming loudly that he was hurt and needed help. Mr. Johnston's wife called 911.

Mr. Johnston stated that he stood behind an interior door in the house that separated the living room from the bedrooms, yelling at the intruder to not open the door. He recalled that "there was a hesitancy there and the door knob did start to turn, and at that point in time I did fire my weapon over the door." After the warning shot, Mr. Johnston heard "scampering on the other side." The damage to his home was "not extensive," totaling "maybe a $1,000.00," but there was blood "all over the place" from the intruder's bleeding.

On cross-examination, Mr. Johnston recalled that the intruder initially said, "I need help, I need help, I've been injured." However, after Mr. Johnston informed the intruder that he had called 911 and help was on the way, the intruder "didn't say anything specific other than my little girl, my little girl," which made Mr. Johnston's wife worry that a young girl was "out there or something hurt somewhere."

Andrea K. Johnston, Mr. Johnston's wife, recalled the event of the intruder's breaking into their home similarly to her husband. She elaborated that the intruder said, "[M]y little girl, I'm hurt and my little girl, I love my little girl." Asked how that night had affected her life, Mrs. Johnston said that she was "way more frightened and paranoid than [she] was before" and that she was more protective of her young son. She recalled that her son asked her about "the crazy guy that was yelling . . . [and] came through [their] window" and that he seemed more afraid at bedtime than he was before. Asked what kind of punishment she thought the defendant should receive, Mrs. Johnston said,

> I would like it to be significant. . . . [P]eople want to talk about well, you know, the drugs. That's still a choice to take those drugs and it shouldn't be a reason for other people to say, well, I can just do that, too, and not get in trouble. It's the behavior and the hurting of many people, not just us, you know, his loved ones they're affected, too.

The defendant testified on his own behalf at the sentencing hearing. He began by "apologiz[ing] to everybody that [he] came in contact with that night." He said that he was not in his right mind and was not trying to hurt anyone. He stated that he quit school in the eleventh grade and worked until he started having problems with drugs in late 2013. The defendant recalled that his drug use began when a coworker told him that "he had something that could help [him] get through the night" when he was working the second shift. The coworker did not tell him what it was, only saying, "[S]nort it, it'll help you."

The defendant said that he started "running around with the wrong people" after he began using drugs and that he used drugs almost daily. His family stopped having anything to do with him because they saw he was not seeking help for his drug problem. The defendant said that he was almost twenty-four years old at the time of the sentencing hearing and that he was the father of "[o]ne child and one on the way." He was engaged to marry the mother of his expectant child.

With regard to the night of the crimes in this case, the defendant testified that he was staying at a friend's house and went with his friend's cousin to get drugs. After taking the drugs, he began to feel weird, so he took a bath and planned to go to bed. He started to feel "real funny" and thought he was having a panic attack. His friend "got a

-5-

pill and put it in [his] mouth." He recalled that "it exceeded from there, just [his] heart pounding, felt like [he] was having a heart attack." He ran outside barefooted and wearing only pajama pants and a tee shirt in twenty-degree weather to go to his friend's grandmother's house nearby to call an ambulance because he did not have a phone. While he was running, he "started blacking in and out and when [he] came to [him]self [he] was running up the road." He recalled going toward the police but thought that he was telling them that he needed help and to go to a hospital. He remembered "getting put on the ground and blacking out," but when he came to he was running down the road toward Franklin County. He did not remember getting into a truck, saying, "I remember coming to myself and I was driving a vehicle," and the vehicle hit an embankment.

The defendant stated that he did not remember getting out of the truck after wrecking it but remembered going into someone's yard and knocking on the door of their house. He did not know how he got into the house and said that he did not have a child with him that night. He remembered the police "taking [him] down when [he] was on the side of the road. [He] had stopped on the side of the road and they took [him] down, but [he] d[id]n't remember."

The defendant said that the night of the offenses, thirteen months ago, was the last time he had taken any kind of drug. He said that he was presently working a full-time job at Royal Remanufacturing and had "started working on the line and . . . worked [him]self up as a line lead." He had been reporting to a probation officer every week without any problems, including passing weekly drug tests. At the time of the hearing, he was living with his fiancée and her two daughters in a house he rented in Marion County. The defendant agreed that he or his family had already contacted the victims to try to make restitution for damages they sustained.

Brent Basham with the Tennessee Department of Correction testified that he had been monitoring the defendant since September 11, 2015. He saw the defendant once a week and drug-tested him "[e]very single week." The defendant never hesitated in taking a test and never tested positive. Mr. Basham was aware that the defendant was employed and said that the defendant was following all the rules of supervision. Asked whether he had any concerns that the defendant would not be able to complete a period of probation, Mr. Basham said, "I don't see why he wouldn't be able to."

Jackson Crouch testified that he had known the defendant for ten years, since the defendant was fourteen years old. Mr. Crouch had never known the defendant to be violent or aggressive. Mr. Crouch said that the defendant worked with him at Royal Remanufacturing prior to 2013 when the defendant left to work for O'Neil Color, which was "when it started spiraling down hill on him." Mr. Crouch stated that the underlying actions taken by the defendant in this case did not "sound like the Chris that [he] knew

-6-

growing up." Mr. Crouch said that the defendant seemed to have "straightened up," noting he had started working again and was "taking care of . . . all that stuff from the past[.]"

Mr. Crouch testified that the defendant's attendance at work was "great" and that the defendant had "moved up quick." Mr. Crouch felt that the defendant had "pretty much already beat" his drug problem. He said that the defendant had made amends with Mr. Crouch's son, who had previously looked up to the defendant and was hurt when the defendant stopped spending time with him.

Kathy Smith, the defendant's mother, testified that the defendant was a well-behaved child growing up and did not have an aggressive side or violent tendencies. She saw changes in him in 2013 when he was working at O'Neil Color – he was "very agitated, not himself at all." She was surprised to learn of the charges against the defendant and did not feel that he would have intentionally committed such acts. When she visited the defendant in the hospital on the night in question, the defendant "wasn't himself." She believed that the defendant had his addiction under control and was more mature.

Troy Middlebrooks, an active member of Sequatchie Valley Free Holiness Church, testified that he did not know the details about the defendant's involvement with drugs but knew that the defendant was doing something of which his mother did not approve. The defendant was presently a regular attendee of church with his fiancée and appeared to be "the sweet . . . old Chris that [he] knew before any of this ever come about."

After the conclusion of the sentencing hearing, the trial court denied diversion and probation and imposed a sentence of confinement.

## ANALYSIS

On appeal, the defendant argues that the trial court abused its discretion in denying an alternative sentence and imposing a sentence of full confinement.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This standard of review also applies to "questions related to probation or any other alternative sentence," State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), as well as to the grant or denial of judicial diversion. State v. King, 432 S.W.3d 316, 324-25 (Tenn. 2014).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is

-8-

upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

Moreover, following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Id. § 40-35-313(a)(1)(A). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought, is not seeking deferral of further proceedings for a sexual offense, a violation of section 71-6-117 or section 71-6-119, or a Class A or Class B felony, and who has not been previously convicted of a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court must consider all of the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. Id. Because "judicial diversion is a form of probation, see Tenn. Code Ann. § 40-35-313(a)(1)(A)[,] . . . the trial court's findings regarding the defendant's suitability for full probation . . . apply equally to its decision regarding the defendant's suitability for judicial diversion." State v. Neil Thompson, No. W2008-00311-CCA-R3-CD, 2009 WL 1034519, at *13 (Tenn. Crim. App. Apr. 17, 2009) (citing State v. Vivian Braxton, No. W2004-02506-CCA-R3-CD, 2005 WL 3059435, at *9 n.4 (Tenn. Crim. App. Nov. 10, 2005), perm. app. denied (Tenn. Mar. 20, 2006)).

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

We conclude that the record before us supports the trial court's imposition of a sentence of confinement. In determining the defendant's sentence, the trial court explicitly considered the evidence presented at the plea and sentencing hearings, the presentence report, the principles of sentencing, arguments made as to the sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors, any statistical information provided by the administrative office of the courts as to sentencing

practices for similar offenses in Tennessee, the statement made by the defendant at the sentencing hearing, and defendant's potential for rehabilitation or treatment.

In considering the possibility of probation, the trial court noted that "[v]arious witnesses testified that before the drug use [the defendant] was a good person, a fine young man and then . . . after the drugs he was completely different." The court elaborated, "During drug use, [the defendant was] the type of person we don't want running around in our society. It's that simple." The court noted in the defendant's favor that there was no proof the defendant had any issues concerning his mental and physical health. The court "g[a]ve the defendant credit for not having any criminal history of convictions" and considered the defendant's potential for rehabilitation to be in the defendant's favor because of his lack of criminal history and he seemed to "have obeyed himself since all this ha[d] happened." The court opined that it reasonably appeared that the defendant would abide by the terms of probation. However, the court noted the seriousness of the circumstances of the offenses, which it determined "trump and outweigh virtually every other factor you could think of."

In considering the interests of society in being protected from possible future criminal conduct of the defendant, the court said:

> I hope that the defendant has defeated his addiction to methamphetamine. My experience with people addicted to methamphetamine is there is a high rate of relapse. I hope that is not the case at all here, but that's something the Court has to consider. I can't simply put my head in the sand and ignore the fact that the relapse rate is 80, 90 percent. So the interest of society being protected from possible future criminal conduct of the defendant are great, based upon his admitted drug use in the past and the crimes that we're here on today, I think there . . . is a possibility for future criminal conduct.

The court then considered and determined that a sentence of probation would unduly depreciate the seriousness of the offenses, and that confinement was particularly suited to provide an effective deterrent. As to deterrence, the court elaborated:

> Marion County . . . is a small town, [the defendant] . . . admittedly r[a]n around a lot of people who don't behave themselves properly and . . . they know what happened that night and all of a sudden . . . [the trial court has] just . . . slapped him on the hand and put him back out on the street, I think that would get around pretty quick in Marion County and not deter similar activity.

The court also determined that although the crimes were not particularly gross or heinous, they were "enormous" in that the defendant committed the "terrifying" act of kicking in the door to a family's home during the night.

The trial court noted the factors it considered in determining whether to grant or deny judicial diversion, including the defendant's amenability to correction, the circumstances of the offense, the defendant's criminal record, the defendant's social history, the defendant's mental and physical health, and the deterrent effect of the sentencing decision to the defendant and other similarly situated defendants. The court noted that the defendant appeared to be amenable to correction and had a good social history except during the period of his drug use, but the court determined that the circumstances of the offenses weighed heavily against judicial diversion, outweighing all other factors. Specifically, the court found:

> The home invasion in Marion County, and the people were home. Then stealing a vehicle, fighting with law enforcement. Severely injuring a law enforcement officer. Then another home invasion in Franklin County where the people are home. A husband, a wife, an eight year old child, the mother-in-law. . . . [T]he circumstances of the offenses here outweigh all these other factors, including the defendant's criminal record, which he does not have a criminal record.

The court concluded that "the severity of these crimes warrant a criminal conviction and for him to have the criminal conviction on his record so people know what he did." The court noted the defendant's failure to take personal responsibility for his drug use in that he "constantly blamed it on other people, he blamed it on a friend at work, who just pretty much almost forced him into snorting this stuff at work and then he blamed it on the friends he's running around with." The court also noted the defendant's lack of emotion even though he was "facing six years in prison [and] facing the people who he terrorized that night in their home" and forcing his mother to "take the stand and testify for [him]."

The court lastly questioned the defendant's claim that "he was not in his right mind [and] . . . didn't know what he was doing," noting that the defendant "had enough sense" to "pull on the emotions" of the victims by saying that his little girl was hurt, possibly as a ploy to gain access to their home. The court also noted that the defendant "had enough presence of mind" to run when he heard a gunshot.

The court concluded by imposing a sentence of six years' incarceration based on the factors it set forth and its analysis of those factors and application to the facts of the case.

The record shows that the trial court engaged in a detailed and thorough analysis to determine whether the defendant should be granted judicial diversion or probation. The court ultimately determined that the nature and circumstances of the offenses, the need to avoid depreciating the seriousness of the offenses, and that confinement was particularly suited to provide an effective deterrent to others likely to commit similar offenses justified the denial of an alternative sentence.

Generally, to deny alternative sentencing solely on the basis of the seriousness of the offense, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement." State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)). Also, to determine whether a trial court has properly found a need for deterrence, this court usually looks to State v. Hooper, 29 S.W.3d 1 (Tenn. 2000), in which our supreme court noted five factors to consider when denying probation on the basis of deterrence and held that a trial court may impose a sentence of incarceration based solely on a need for deterrence "when the record contains evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." Id. at 10-13.

Recently, however, our supreme court determined in State v. Kyto Sihapanya, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *3 (Tenn. Apr. 30, 2014), that "the heightened standard of review [from Trotter and Hooper] that applies to cases in which the trial court denies probation based on only one of these factors is inapplicable" when the trial court "combined the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense." Here, the trial court did not base its denial of an alternative sentence on one factor alone, but on a combination of factors. Again, "the abuse of discretion standard accompanied by a presumption of reasonableness applies to all sentencing decisions, including the grant or denial of judicial diversion." King, 432 S.W.3d at 325. The trial court did not abuse its discretion in imposing a sentence of confinement.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE

-13-